IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS, OREGON WILD, )
and CENTER FOR BIOLOGICAL         )
DIVERSITY,                        )
                                  )
                Plaintiffs,       )     Civil No. 6: 14-1236-TC
                                  )
        v.                        )     O R D E R
                                  )
JIM THRAILKILL, Field Supervisor,)
Roseburg Field Office, in his     )
capacity, UNITED STATES FISH AND )
WILDLIFE SERVICE, an agency       )
within the United States          )
Department of Interior,           )
et al.,                           )
                Defendants,       )
                                  )
ROUGH & READY LUMBER LLC,         )
SWANSON GROUP MFG. LLC, and       )
BOISE CASCADE WOOD PRODUCTS LLC, )
                                  )
        Defendant-Intervenors.    )

COFFIN, Magistrate Judge:

    Plaintiffs bring this action pursuant  to the Administrative

Procedures Act, 5 U.S.C. §§ 701 et seq.   They seek to enjoin a

federal action allowing logging activities in an area affected by fire.

Presently before the court is plaintiffs' motion (#13) for a preliminary injunction. Plaintiffs make numerous arguments in support of multiple claims and counts, but ultimately the arguments are not persuasive and, for the reasons stated below, the motion for a preliminary injunction is denied.

<u>Factual Background & Legal Background</u>

<u>The Douglas Fire Complex and the Douglas Fire Complex Recovery Project</u>

The Douglas Fire Complex burned approximately 48,000 acres of federal and non-federally managed land in the southern Oregon Klamath Mountains.

In response to the Douglas Fire Complex, the Medford District of the Bureau of Land Management (BLM) prepared the Douglas Fire Complex Recovery Project. The BLM issued the Douglas Fire Complex Recovery Project Environmental Assessment (EA) for public comment on May 7, 2014, and took public comment until July 22, 2011. Plaintiffs provided timely comments on the Douglas Fire Complex Recovery Project EA. The BLM issued a Decision Record and Finding of No Significant Impact (DR/FONSI) approving the Douglas Fire Complex Recovery Project on June 26, 2014. The BLM's DR/FONSI

authorizes salvage logging on approximately 1,276 acres of BLM land, and includes hazard tree removal along roads (to which Plaintiffs do not object), as well as logging of interior forests for economic recovery. The BLM submitted a Biological Assessment (BA) to FWS on April 28, 2014, determining the project "may affect and is likely to adversely affect" (LAA) spotted owls and their critical habitat. FWS subsequently issued the challenged BiOp. The Douglas Fire Complex Salvage Timber Sales include the Rogue Cow, Burnt Rattler, and Rock Star Timber Sales. The sales are located in the Grants Pass Resource Area of the BLM's Medford District, and logging operations are currently underway.

<u>FWS Biologic Opinion for the Douglas Fire Complex Recovery Project</u>

on June 25, 2014, in response to BLM's submission of its biological assessment, the FWS issued a Biological Opinion (BiOp) of the Douglas Fire Complex Recovery Project. In the BiOp, "the Service concludes that the proposed Project is likely to incidentally take 14 adult and up to 10 young spotted owls[1], at seven sites. The take is in the form of harm caused by habitat destruction or degradation via timber harvest of up to 33 acres of

---

[1]The authorization of the take of the ten young spotted owls is based on a prediction of the offspring from these 7 sites.

NRF[2] habitat and 1,049 acres of PFF[3] habitat that is likely to significantly disrupt the breeding, feeding, and sheltering behavior of these spotted owls to an extent that causes injury or death. BiOp, 59. The BiOp also concludes that the Douglas Fire Complex Recovery Project "is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat." BiOp, 59.

The Endangered Species Act

Congress enacted the ESA with the purpose to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and to "provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An Endangered Species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1522(6); 50 C.F.R. § 424.02(e). A Threatened Species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(19); 50 C.F.R. § 424.02(m). The northern spotted owl is a threatened species.

Section 7 of the ESA requires federal agencies to conserve

---

[2]The acronym for "nesting, roosting, , foraging."

[3]The acronym for "post-fire foraging."

species listed as endangered or threatened under the ESA, and whenever a federal action may affect an ESA-listed species, the agency undertaking such an action must consult the Service having jurisdiction over the relevant listed species. 16 U.S.C. 1536(a)(3). The United States Fish and Wildlife Service (FWS) is responsible for administering the ESA with respect to terrestrial wildlife. 50 C.F.R. §402.01(b). FWS, as the consulting agency for terrestrial wildlife, evaluates the effects of the proposed federal action on the survival and recovery of Endangered or Threatened species and any potential destruction or adverse modification of critical habitat in a biological opinion. 16 U.S.C. § 1536(a)(2).

A biological opinion is the heart of the ESA Section 7 consultation process, which requires federal agencies to "insure that any action authorized, funded, or carried out by such agency...is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The biological opinion must be based on "the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). In the biological opinion, the FWS evaluates: 1) the current status of the listed species or critical habitat; 2) the effects of the action; and 3) the

cumulative effects to determine if the proposed action will jeopardize the existence of the listed species. 50 C.F.R. §§ 402.14(g)(2), (g)(3).

If the biological opinion concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a "reasonable and prudent alternative" to the agency action that avoids jeopardy and adverse modification and that the "incidental taking" of endangered or threatened species will not violate section 7(a)(2), the consulting agency can issue an Incidental Take Statement (ITS) which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. Section 9 of the ESA makes it unlawful for any person to take an ESA-listed species. 16 U.S.C. § 1538(a)(1).[4]

Section 4 of the ESA states that FWS "shall develop and implement plans...referred to as 'recovery plans' for the conservation and recovery" of species listed under the Act. 16 U.S.C. §1533(f). "Conservation" refers to "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided

---

[4]Take is defined as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in such conduct." 16 U.S.C. § 1532(19). Harm is defined to include significant habitat modification or degradation that results in death or injury to a listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.   50 C.F.R. §17.3.

pursuant to this Act are no longer necessary," and "conservation" is synonymous with the "recovery" of a species in the ESA context. 16 U.S.C. § 1532(3). Congress expects FWS to proactively utilize the conservation measures contained in recovery plans to remove the species from the protection of the ESA. 16 U.S.C. §§ 1533(f)(1)(B)(i)-(iii).

Administrative Procedures Act

The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions … found to be arbitrary , capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

A decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence in front of  the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n. v. State farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Standards for Preliminary Injunction

        In the landmark case of Winter v. Natural Resources
Defense Council, the Supreme Court clarified that in order to
obtain an injunction, a plaintiff must establish that (1) it is
likely to succeed on the merits, (2) it is likely to suffer
irreparable harm in the absence of injunctive relief,[5] (3) the
balance of the equities tips in its favor[6], and (4) an injunction .

_____

        [5]A plaintiff must show that absent an injunction, irreparable
harm is not only possible, but likely. Winter, 555 U.S. at 22. In
Bozeman, the Montana District Court developed what has become known
as the Bozeman burden-shifting framework as a practical means to guide
its analysis of irreparable harm in light of two divergent lines of
Ninth Circuit cases articulating the plaintiff's burden in ESA cases.
First, "a plaintiff must substantiate its claim by alleging a specific
irreparable harm resulting from the ESA violation" so that the court
may "tailor an injunction to remedy that harm." Bozeman, 950 F.Supp.2d
1196, 1202 (D. Mont. 2013). At the outset, "the plaintiff must allege
that, as a result of the ESA violation, a project will jeopardize the
continued existence of a specific endangered or threatened species or
will destroy or adversely modify its critical habitat." Id. (relying
on Burlington Northern, 23 F.3d 1508,1511 (9th Cir. 1994)). If the
plaintiff satisfactorily alleges specific harm, the court presumes the
harm to be irreparable and the burden shifts to the agency, "which
must show that the action will not jeopardize the species or destroy
or adversely modify its critical habitat." Id . (citing Wash. Toxics
Coal. v. EPA, 413 F.3d 1024, 1035 (9th Cir. 2005)). If the agency
presents sufficient evidence, the plaintiff must produce its own
evidence of irreparable harm in order for an injunction to issue. Id
at 1203 (relying on Burlington Northern and National Marine Fisheries
Service, 422 F.3d 782 (9th Cir. 2005)).


        [6]In ESA claims, the balance of the hardships always tips sharply
in favor of the endangered or threatened species. Wash. Toxics, 413
F.3d at 1035; see also Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1073
(9th Cir.1996) ("Congress has determined that under the ESA the
balance of hardships always tips sharply in favor of endangered or
threatened species").

is in the public interest. 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

In order to secure an injunction, a plaintiff must satisfy all four Winter prongs. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir.2011).

As to likelihood of success on the merits, the long-entrenched but lesser "serious questions" standard remains viable after Winter. Cottrell, 632 F.3d at 1134-35. In Cottrell, the Court held that serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met. Id. at 1132. Cottrell clarifies that district courts retain discretion to employ a sliding scale, and that plaintiffs are entitled to judicial application of the lesser "serious questions" test upon satisfactory showing on the other three Winter prongs. Id. at 1135 ("Because it did not employ the 'serious questions' test, the district court made an error of law in denying the preliminary injunction sought by AWR. We conclude that AWR has shown that there is a likelihood of irreparable harm; that there are at least serious questions on the merits ...; that the balance of hardships tips sharply in its favor; and that the public interest favors a preliminary injunction").

9 - ORDER

As discussed in more detail below, plaintiff has not adequately established that they are likely to succeed on the merits.

A likelihood of success for plaintiffs is simply not present in this action, nor are there "serious questions" going to the merits. Further, there is a lack of the likelihood of irreparable harm to the species. I find the "serious questions" test is not applicable, but even if it were, defendants would prevail due to, as discussed below: the lack of the likelihood of irreparable harm to the species and the public's interest in the economic and environmental benefits of the project including providing jobs and retaining infrastructure for them, fuel reduction benefits to decrease the intensity and severity of future fires, and avoiding insect buildup that can threaten adjoining trees.

Discussion

I. The Effect of Barred Owls on Spotted Owl Detectability

Plaintiffs argue that when barred owls are present, spotted owls are less likely to respond to calls. Plaintiffs assert that FWS did not take this possibility into account and may thus have underestimated the number of spotted owl sites by relying on false "no occupancy" determinations.

10 - ORDER

Plaintiffs argue that the FWS "entirely failed to consider an important aspect of the problem" or " offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" when it reached its No Jeopardy conclusion in the Douglas Fire Complex BiOp. Lands Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010). Plaintiffs contend that since FWS has not "considered the relevant factors and articulated a rational connection between the facts found and the choices made," its biological opinion authorizing the proposed action is arbitrary, capricious, and not in accordance with the Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008); 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1536(b)(4).

I disagree. FWS did acknowledge and account for the potential impact of barred owls on detectability. FWS noted that barred owls have been "detected in almost half of the known spotted owl sites" and barred owl presence may reduce spotted owl detectability. BiOp at 18, 23, 92; see also id. at 93 ("Monitoring and management of northern spotted owls has become more complicated due to their possible reduced detectability when barred owls are present.") FWS used the best available scientific information—a host of long term and consistent BLM surveys for the Study Area—which largely overlaps the action area—to determine the locations of spotted owls in the action area. BiOp at 20; BA, App.

"D". FWS noted that the Study Area has been subject to a constant survey effort. Id. at 21; see also 12/5/13 Post Fire Treatment/ Sideboards Meeting Memorandum at 4 ("There is a lot of great survey data in this fire area since most of it is within the [Study Area]"). Due to the long term and consistent nature of those surveys, surveyors are aware of site locations and spotted owl movement patterns and are particularly efficient in finding hard to detect spotted owls in the action area. Notably, plaintiffs do not claim that FWS failed to rely on the best available scientific information in counting potentially affected sites. Nor do they cite any alternative site occupancy data other than the surveys on which FWS relied. Kandra v. United States, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001)(agencies

have wide latitude to determine what is the best scientific and commercial data available and courts presume that agencies have used the best scientific and commercial data available unless those challenging the agency actions can identify relevant data not considered).

Additionally, as a precaution, FWS recommended that BLM continue surveys during the upcoming survey season, so as to continue to inform salvage project planning as needed to further

reduce impacts to spotted owls. BiOp at 60; see also BiOp at 41 (BLM "is conducting surveys for spotted owls in 2014 and if spotted owls are found occupying these sites, the Level 1 Team will need to discuss appropriate ESA measures.") "[I]f new spotted owl sites are located during surveys, biologists will review [the project design criteria] and the [BiOp] to confirm the ESA analysis remains valid." BA at 18. As such, the record demonstrates that FWS used the best available scientific information to identify the location of spotted owls in the action area. McNair, 629 F.3d at 1074 (courts need only ensure that FWS did not fail to consider an important aspect of the problem); cf. 16 U.S.C. § 1536(a)(2) ("In fulfilling [its obligation to consult to ensure that agency actions do not jeopardize ESA listed species], each agency shall use the best scientific and commercial data available."); Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 214-221 (D.D.C. 2005) ("[a]n agency's use of a model is arbitrary [only] if that model 'bears no rational relationship to the reality it purports to represent.' "); see generally Oceana Inc. , at 214-21.

The court finds that the government's action is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

II.  <u>The Effect of Wildfire on Spotted Owl Habitat Use</u>

Plaintiffs also argue that the best scientific information indicates that spotted owls expand their core areas and home ranges in post-fire environments in order to satisfy life cycle needs including roosting and foraging.

Plaintiffs argue FWS has provided no rationale for disregarding the [allegedly] undisputed best scientific evidence on spotted owl use of habitat post-fire in its jeopardy analysis, indicating that it has "entirely failed to consider an important aspect of the problem" and "offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," <u>McNair</u>, 629 F.3d at 1074, and thus, the agency's conclusions are arbitrary, capricious , not based on the best available scientific information, and not in accordance with the ESA.  5 U.S.C. §706(2)(A); 16 U.S.C. §1436 (a)(2); 16 U.S.C. § 1536(b)(4).

The record before me, however, does not support plaintiffs' contention.  First, FWS fully considered the possibility that spotted owls may have shifted their core use areas and home ranges post-fire. BiOp at 32, 33-34, 40 (shifts possible in 8 of 14 sites); 131 (studies concerning effect of fire inconclusive), 133. Plaintiffs have provided no evidence that any home ranges have expanded. FWS cautioned that "[r]esponses such as shifts in home

14 - ORDER

ranges . . . in some cases can be difficult to predict" but nevertheless identified eight sites that may have shifted. BiOp at 40, 131. In short, contrary to plaintiffs' allegations, FWS used the abundant data available from the Study Area to identify, to the extent practicable, those sites where spotted owls may have shifted post-fire.

Second, the one study plaintiffs cite, "Clark 2007", does not support the plaintiffs. Clark 2007 ultimately did not find profound differences between core-use areas or home ranges inside and outside of fire boundaries. See, e.g., Clark 2007 at 83 ("Home ranges were larger following wildfire in my study, but high severity wildfire and salvage logging were not important variables influencing home ranges as initially predicted."). Moreover, the home ranges and core-use areas used in the Clark study were actually smaller than those used by FWS. Clark 2007 at 75 (Table showing the Clark used a 618 hectare (1527 acres) Mean (All Owls) home range size, versus FWS's 1.3 mile (3,398 acre) home range, and Clark used a 50 hectare (123 acres) Mean (All Owls) core-use area size, versus FWS's 0.5 mile (500 acres) core-use area circle. In other words, FWS used home range circles that were twice as large, and core-use area circles that were four times larger than those used by Clark in his 2007 study. FWS's methodology therefore provides an appropriate basis upon which to evaluate habitat conditions for potential shifts by spotted owls. Notably,

15 - ORDER

plaintiffs do not propose any alternative home range or core-use area circle size that they believe FWS should have used. FWS's use of a 1.3 mile home range and 0.5 mile core-use area was reasonable. Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 214-221 (D.D.C. 2005) ("[a]n agency's use of a model is arbitrary [only] if that model 'bears no rational relationship to the reality it purports to represent' ".)

Nor do the two other documents that plaintiffs cite help them. The first, a June 2014 email from Robin Snider, a BLM official, to two FWS officials, Jim Thrailkill and Cindy Donegan, is irrelevant. It suggests that a single spotted owl movement from one site to another due to the presence of a barred owl-not the Douglas fires. The email is not evidence that any spotted owls are expanding or shifting their core-use areas or home ranges as a result of the Douglas Complex fires. In any event, FWS tracked the owl that Ms. Snider was referring to and was aware of and accounted for its movement. The second, a December 5, 2013, internal FWS memorandum, makes the unremarkable suggestion that some owls may move due to new conditions created by the Douglas Complex fires. 12/5/13 Memorandum at 3-4 (located in the "Other" folder of the partial AR). FWS anticipated and took such potential shifts into account. First, FWS did so by using a 1.3 mile radius home range and 0.5 mile core-use area size estimates, as discussed above. Second, as mentioned above, the action area has been subject to long term,

intensive spotted owl demographic study. FWS was therefore able to evaluate previous spotted owl response and movement areas along with remaining habitat post-fire to consider potential shifts. BiOp at 39 (showing ability of FWS to track color banded owls at numerous sites). Indeed, using this intensive data, FWS was able to specifically identify spotted owls at 8 of 14 sites that could potentially shift. BiOp at 40 (shifts possible in 8 of 14 sites); see also BA at 23 ("These shifts are especially evident in this project area because individual owls have been banded with unique color combinations. In many cases, the survey crew has been able to identify the same pair of owls using multiple nest locations in alternate years and therefore establishing the potential territory.")

Accordingly, the record demonstrates that FWS adequately and lawfully accounted for the effect of wildfire on spotted owl site locations, and that the government's action is not arbitrary , capricious, an abuse of discretion or otherwise not in accordance with the law.


III.    The Assessment of the Effects of All Potentially Affected
Owl Sites

Plaintiffs argue that the FWS failed to comply with the ESA when it: 1)did not assess the effects of the proposed action on 6 known spotted owl sites that overlap the planning area, but do not

17 - ORDER

overlap the salvage units; 2) did not explain why it used two different methods for assessing effects to the species; and 3) inconsistently applied its effects analysis methodologies to the facts before it.

Plaintiffs contend that while FWS is permitted to use methodologies to assess the effects to listed species from a proposed action, the agency must employ those methodologies in a reasoned and not arbitrary manner. Plaintiffs argue that the FWS, however, has used the NLAA and LAA unequally, arriving at fallacious conclusions about the effects of the Douglas Fire Complex project that are simply not supported by the facts. As the Ninth Circuit in <u>McNair</u> held, a decision is arbitrary and capricious if the agency "offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>McNair</u>, 629 F.3d at 1074. Plaintiffs conclude that the FWS Douglas Fire Complex BiOp is therefore arbitrary, capricious, and not in accordance with the ESA.    5 U.S.C. §706(2)(A); 16 U.S.C. §1436 (a)(2); 50 C.F.R. §402.14(I);    16 U.S.C. §§1536(a)(2), 1536(b)(4).

Again, I reject plaintiffs' arguments.  Under the ESA, consultation is required when a federal action "may affect" a listed species. 50 C.F.R. § 402.14 ("Each Federal agency shall review its actions at the earliest possible time to determine

18 - ORDER

whether any action may affect listed species . . . . "). For management activities potentially impacting territorial organisms such as spotted owls, FWS analyzes an area corresponding to the movements and activity patterns of individual spotted owls occupying a given territory. BiOp at 26-28. To evaluate spotted owl use of an area and habitat and human impacts, FWS conducts its assessment at the two areas around the spotted owl nest: the home range and core use areas. Id. at 26. Here, BLM appropriately defined the action area to encompass all lands within any provincial home ranges of known spotted owl sites that could be directly, indirectly or cumulatively impacted by the proposed action. BA at 18. BLM explained that of the 45 historical nest sites located within the action area, only 39 would be subject to any salvage treatment or road or landing construction within their home ranges. BA at 37. In other words, while the home ranges of six sites overlapped with portions of the action area, none of them could possibly be affected by the habitat modifications planned as part of the Project. BA at 37; BiOp at 36, 41; cf. 50 C.F.R. § 402.02 (Action Area defined as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action"). Plaintiffs do not suggest otherwise. In sum, FWS reasonably and appropriately analyzed all 39 spotted owl nest sites that the Project "may" effect and there was no need for any further analysis. 50 C.F.R. § 402.14.

Plaintiffs claim that the BiOp incorrectly determined that owl site numbers 2016A, 2080A/C, 3928O, and 4690A/C would exhibit 40% NRF coverage at the home range and 50% NRF coverage at the core-use area scale. Plaintiffs therefore assert that the BiOp inappropriately concluded that the timber operations would not adversely affect these sites. However, Plaintiffs' assertions are premised on incorrect readings of the facts and the law.

Plaintiffs seek to convert what are essentially guidelines into non-existent "thresholds." FWS commonly evaluates projects with the potential to modify habitat on the basis, among other things, of how much habitat lies within a spotted owl home range and core-use area. The evaluation is "generally" based on whether a home range has 40 percent NRF habitat and a core-use area has 50 percent NRF habitat. BiOp at 26-30. The 40- 50% figures, however, represent mere estimates. BA at 36 (local conditions and possibly pair experience, contribute to large variance in actual amounts of older forest within the core-use area necessary for reproduction and survival for individual owls); BiOp at 32 ("best available information suggests that a single threshold value for determining post-fire occupancy of burned areas by spotted owls is difficult to ascertain"); id. at 42 (BiOp stating that post-project NRF habitat levels are "generally" near 40 and 50 percent at the home range and core-use scales, respectively). FWS uses these estimates to

evaluate potential adverse effects and take. Plaintiffs' argument is thus based on a misreading of FWS's methodology.

Plaintiffs also err in failing to consider the larger context of FWS's analysis. FWS takes a host of other site-specific factors into account beyond the amount of NRF habitat remaining at a given site. BiOp at 26-30, 35-36. Spotted owl habitat use is driven by a complex mix of habitat conditions. BiOp at 30 (FWS recognizing that "many different combinations of forest habitat structure and amount at various spatial scales may support viable owl territories . . .) Pertinent site specific circumstances included the post-fire condition of NRF habitat, the amount of PFF habitat remaining or planned for removal and its proximity to NRF habitat, spotted owl site occupancy in the action area, and abiotic factors such as the slope position of proposed harvest units. BiOp at 132. In addition, FWS assesses an area's relative habitat suitability ("RHS") to help inform the likelihood of spotted owl occupancy and/or potential use of an area. BiOp at 37; USDI FWS 2011 Revised Northern Spotted Owl Recovery Plan, App. "C" at C42, C56. In some areas, RHS was determined to be low for certain areas pre-fire. BA at 49-52 (Table 16). Spotted owls typically avoid such areas during breeding periods. 2011 Revised Northern Spotted Owl Recovery Plan at 56. FWS carefully and appropriately deployed this methodology here. For example, the core-use area for site 2016A is relatively intact. BA at 26. The pre- and post-fire core use percentages of NRF habitat

21 - ORDER

were above 50%, at 65%. BA at 26. In the BLM Medford District more
generally, BLM has observed high occupancy and reproduction rates
when only 35 percent NRF habitat exists in core-use areas. BA at
24.

FWS correctly determined that the large amount of core use
area habitat available at this site would likely support a
relatively higher level of site occupancy and habitat-fitness
potential. Id.; see also Dugger et al. 2005; FWS 2009; Olson et al.
2004; Bart and Forsman 1992. This also diminished the relative
importance of the home range condition. Id. Separately, BLM had
proposed no NRF or PFF for removal at the core-use area scale. BA
at 50. Additionally, the post-fire home range area will remain at
30% NRF coverage. BA at 50. It declined only 2% post-fire. BA at
26. And, while BLM proposed some PFF harvest within the home range,
that treatment would take place near the home range's outer
perimeter. BA at 50; BiOp at 42. The areas proposed for salvage
treatment were of a low relative habitat suitability pre-fire. BA
at 50; BiOp at 42. Taking these factors into account, FWS logically
determined that the Project is not likely to adversely affect Site
2016A.

Similarly, in the aggregate, Site Number 2080A/C contains
approximately 45 percent core-use area NRF habitat. BA at 26.
Intact and contiguous habitat is still present in the core-use

area. Id. About one acre of PFF habitat is proposed for removal in the core-use area and represents less than one percent of the available NRF and PFF habitat available in the core-use area. BA at 51. At the home range scale, in the aggregate, 34 percent NRF habitat is available. BA at 26. 23 acres of PFF is proposed for harvest in the core and home range scale, but this represents less than two percent of available NRF and PFF habitat at this site. Id. at 51. In short, the record fully supports FWS's concurrence with BLM's "not likely to adversely affect" determination for this site.

FWS consistently applied this same methodology to site number 4690A/O. At the core use area scale, in the aggregate this site exhibits 47% NRF habitat. BA at 26. No NRF or PFF is proposed for removal in the core-use area of this site. BA at 51. At the home range scale, the aggregate NRF coverage approximates 40% NRF habitat. BLM proposed to remove up to 34 acres of PFF. However, this would take place near the outer perimeter of the site's home range in low RHS habitat. FWS's NLAA conclusion for Site 46909A/O was therefore entirely reasonable.

Finally, plaintiffs are simply incorrect in suggesting that site 3928O does not exhibit 40% NRF coverage at the home range or 50% NRF coverage at the core-use area range. (Plaintiffs claiming that Site Number 3928O is "deficient in NRF habitat at the home range, core, or both levels"). The record demonstrates this site is

at 59% home range and 69% core-use area NRF coverage, respectively. BA at 26.

As such, the FWS's concurrence with BLM's Not Likely to Adversely Affect determination for each of the four sites was appropriate.

Next, Plaintiffs claim that FWS inaccurately determined that three sites—0919O, 0377B and 1911C—are unoccupied by spotted owls. Plaintiffs allege that in 2011 a single spotted owl was found at site 0919O, and a spotted owl pair at site 1911C. Plaintiffs' arguments, however, are not supported by the record. Site number 0919O has a long history of surveys showing the site as being unoccupied. BA at 50 ("site has not been occupied in 21 years. Last pair was in 1983."); see also BA App. "C", Medford Douglas NSO RA 10 Site Priority Summary (documenting 21 years of surveys); BA App. "D" at 11 (site unoccupied). Additionally, the nest patch and core-use area of the site were severely burned in 2013 and salvage logging occurred at a separate, adjacent site. BA at 26 (only 19% and 5% NRF habitat remains post-fire in home range and core-use area). Taking all of these factors into account, FWS reasonably concluded that Site 0919O is unoccupied.

Similarly, Site Number 1911C was unoccupied in 2012 and 2013. BA App. "D" at 6 (site unoccupied). Moreover, as with site 0919O, the nest patch, core-use area and home range each experienced at least a moderate to high severity burn in over 30 percent of its

24 - ORDER

acreage. BA at App. "C," Burn Severity at NSO Sites by Home Range,
Core, and Nest Patch Scales. As a result, only 16 percent of NRF
habitat remains at the home range and core use areas. BA at 26.
Taking all of these factors into account, FWS logically determined
that Site Number 1911C is unoccupied. BiOp at 32 (FWS concluded
site would be a loss due to post-fire conditions having little NRF
at core and home range scales), 42 (same).

As to Site Number 0377B, Plaintiffs suggest that FWS made an
error in its reasoning for the NLAA determination for site 0377B.
The BiOp, however, fully explained its NLAA determination. As
plaintiffs note, site 0377B was inadvertently listed twice in the
BiOp's explanation of NLAA findings, under both the second and
fourth factors.  They take issue with the fact that it was listed
under the second factor, but do not contest that it was
appropriately considered under the fourth factor. BiOp at 42-43.
The fourth factor stated that an NLAA finding is appropriate where
the amount of PFF proposed for removal is minimal at the core use
area; a minor amount of PFF removal may occur in the outer
perimeter of the home range and in relatively low habitat
suitability areas. BiOp at 43. FWS's finding that effects to site
0337B are not likely to adversely affect the species is fully
consistent with the record. The BA indicated that (a) only 0.1 acre
of PFF would be removed; (b) the area proposed for harvest is on
the outer edge of the home range and in a low RHS area; and (c) the

25 - ORDER

majority of the home range is outside of areas affected by the fire. BA at 50. The listing of site 0377B additionally under the second factor may have been the result of a typographical error. In any event, the BiOp explains FWS's reasoning based on the fourth factor, and FWS's concurrence with BLM's NLAA conclusion is supported by the record. Buschmann v. Schweiker, 676 F.2d 352, 358 (9th Cir. 1982) (an error is harmless where mistake clearly had no bearing on the substance of the decision reached). In short, FWS's analysis of Site Numbers of 0919O, 0377B, and 1911C was entirely rational.

Plaintiffs next contend that, contrary to FWS's determinations, three sites are occupied. First, plaintiffs contend that at site numbers 1913O and 4607O, respectively, a single owl was found in 2011 and a single or pair of owls were located in 2010. Dkt. 13 at 21, n.6 ("These sites are: 1913O (2011 single owl) . . . ."). As to site number 1913O, the record does not support plaintiffs' claim that an owl was sighted in 2011. BA at App. "D". Moreover, this argument misses the mark because in FWS's expert judgment, the relevant guideline was a lack of occupancy within the "past 2 or 3 years", i.e., since 2012, not 2011. BiOp at 42. Similarly, as for site number 4607O, the record clearly demonstrates that there have been no sightings in the last six years. BA, App. "C": Medford Douglas NSO RA 10 Site Priority Summary (noting "red lettering = no resident owls in the last 6 years"); see also id. at 50 (noting for

site number 4607O "No pair responses in 21 years and no responses in last 6 years"); BA, App. "D": Medford Douglas Action Area – NSO Site History, at 10.

Plaintiffs also allege that the Project will remove more than "minimal" PFF at Site Numbers 4534A/O and 4575A/O and that FWS's not likely to adversely affect determination was arbitrary and capricious. The court rejects plaintiffs' argument, however, because it amounts to a request that the court substitute plaintiffs' definition of "minimal" for the one that FWS employed. The Court instead defers to FWS's expert scientific judgment on what amount of PFF removal is "minimal." Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004) ("[C]ourts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency").

Additionally, contrary to plaintiffs' contention, the role of PFF habitat cannot be evaluated in isolation. Rather, PFF habitat should be viewed in the context of, inter alia, its amount and spatial relationship to remaining NRF habitat. For example, as to Site 4334A, the BA noted that a total of 44 acres of PFF acres would be removed in the home range, but that the areas impacted are in low RHS habitat. BA at 51. Only 0.7 acre of the total PFF acres would be removed at the core-use area, and only 0.1 acres at site area 4534A, "where the most recent activity has been" observed.

27 – ORDER

Id.; see also BA, App. "C": Habitat Treatment Acres by Home Range, Core, and Nest Patch and App. "C": NSO Site Effects (Post-Fire NRF/PFF amounts and Post-Treatment NRF/PFF amounts) (noting de minimus reduction on PFF+NRF habitat post-treatment).

Similarly, for Site Number 4575A/O, the record shows that only 25.5 total PFF acres would be removed in the home range and none would be removed in the core-use area. BA at 51. Moreover, the majority of treated areas are in low RHS, and the core-use area will remain intact with contiguous NRF. Id.

In sum, FWS correctly concluded that the proposed PFF removals were "minimal" and that the Project was not likely to adversely affect spotted owls at those sites.

Plaintiffs next contend that FWS inconsistently applied its methodology for deciding when "take" had occurred at a given owl site. Plaintiffs argue that in one case, where six acres of NRF habitat will be removed from site number 26640, FWS made a "no take" determination, but for site number 46040, where only 4 acres of NRF habitat would be removed, FWS made a "take" determination. However, as FWS explained, to determine if habitat removal likely to be caused by a proposed Federal action is also likely to significantly disrupt the breeding, feeding, or sheltering behavior of the spotted owl to the extent that it actually injures or kills affected spotted owls (i.e., "take" spotted owls), there must be a reasonable certainty that the spotted owl occupies the affected

28 - ORDER

habitat area. BiOp at 40. Plaintiffs neglect to mention that FWS determined that owls are not likely to occupy Site 2664O because of post-fire conditions, but were likely to occupy Site 4604O. Id. FWS clearly stated:

> Four spotted owl sites (2664 . . . ) are not anticipated to be occupied post-fire because 2012 and 2013 surveys and/or long-term pre-fire surveys indicate that these sites are not occupied by spotted owls and/or as having an overall low probability of occupancy.

Id.

Again, the government's action is not arbitrary , capricious, an abuse of discretion or otherwise not in accordance with the law.


IV. Revised Recovery Plan for the Northern Spotted Owl

Plaintiffs also make several contentions regarding the 2011 Recovery Plan Actions 10 and 12.

In 2011, FWS completed the Revised Recovery Plan for the Northern Spotted Owl (NSO Recovery Plan). The Oregon Klamath Province, where the Douglas Complex Fire Recovery Project is located, is designated as a Recovery Unit for the spotted owl populations that inhabit it. NSO Recovery Plan, III-1. "The intended function of this Recovery Unit is to support high quality spotted owl NRF and dispersal habitats." BiOp, 24. According to FWS, "'Recovery Actions' are near-term recommendations to guide the activities needed to accomplish the recovery objectives and achieve

29 - ORDER

the recovery criteria," such that a species may be delisted from ESA protection. NSO Recovery Plan, x.

Recovery Action 10 (RA 10) directs federal agencies to: "Conserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population. The intent of this recovery action is to protect, enhance and develop habitat in the quantity and distribution necessary to provide for the long-term recovery of spotted owls." NSO Recovery Plan, III-44. The NSO Recovery Plan states "this recommendation includes currently occupied as well as historically occupied sites (collectively "spotted owl sites," see Appendix G: Glossary of Terms)." Id. at III-42. The NSO Recovery Plan defines "spotted owl sites" as "an occupied spotted owl site or a spotted owl site where spotted owls were documented to be present in the past." Id. at G-2.

NSO Recovery Plan Recovery Action 12 (RA 12) directs: "In lands where management is focused on development of spotted owl habitat, post-fire silvicultural activities should concentrate on conserving and restoring habitat elements that take a long time to develop (e.g., large trees, medium and large snags, downed wood)." Id. at III-49 (emphasis added). Post-fire logging particularly targets medium and large fire-killed trees (snags) for removal. BiOp 11.

30 - ORDER

Action 10 suggests that, where possible[7], spotted owl sites and high value spotted owl habitat should be conserved. Action 12 urges agencies to focus post-fire activities on conserving and restoring habitat elements that take a long time to develop, e.g., large trees, medium and large snags, and downed wood.

As a threshold matter, plaintiffs' argument fails because recovery plans do not have the force of law and plaintiffs conceded such at oral argument. <u>Friends of Blackwater v. Salazar</u>, 691 F.3d 428, 432-34 (D.C. Cir. 2012); <u>Fund for Animals v. Rice</u>, 85 F.3d 535, 547 (11th Cir. 1996) ("By providing general guidance as to what is required in a recovery plan, the ESA 'breathes discretion at every pore.' ") (quoting <u>Strickland v. Morton</u>, 519 F.2d 467, 469 (9th Cir. 1975)); <u>see also California Native Plant Soc'y v. U.S. E.P.A.</u>, No. 06-03604, 2007 WL 2021796, at *21 (N.D. Cal. July 10, 2007); <u>Conservation Northwest v. Kempthorne</u>, No. 04-1331, 2007 WL 1847143, n.2 (W.D. Wash. June 25, 2007); <u>Biodiversity Legal Foundation v. Norton</u>, 285 F. Supp. 2d 1, 14 (D.D.C. 2003) ("BLF") ("[t]he Court is generally persuaded by the Eleventh Circuit's reasoning in [Rice], and agrees that the …Recovery Plan was merely a guideline, which FWS had discretion to follow."); <u>National Wildlife Fed'n v. National Park Service</u>, 669 F. Supp. 384, 388 (D. Wyo. 1987) ("Plaintiffs would urge upon this Court that the

---

[7]The ESA describes the prototype recovery plan, subject to a reasonableness standard of "the maximum extent practicable," in § 1533(f)(1)(B).

language § 1533(f) obligates the Secretary to develop and implement a recovery plan, and that, once developed, all concerned agencies must adhere to it. The language does not so say."); but see S.W. Center for Biological Diversity v. Bartel, 470 F. Supp. 2d 1118 (S.D. Cal. 2006). They are not binding on federal agencies.

Indeed, plaintiffs are attempting to compare apples to oranges. Under the ESA, FWS's jeopardy analysis considers whether a specific action is reasonably likely to appreciably reduce the likelihood of both survival and recovery of a listed species. 50 C.F.R. § 402.02. Recovery, on the other hand, is the "improvement in the status of listed species to the point at which listing is no longer appropriate . . . ." Id. The jeopardy analysis–which FWS makes rangewide, in Washington, Oregon, and northern California–is concerned with whether a given federal action at the species level would appreciably reduce the likelihood of recovery, not whether that federal action would itself implement or bring about recovery. The court rejects plaintiffs' invitation to blur the two separate and distinct concepts of jeopardy and recovery.

In any event, the BiOp is consistent with Recovery Actions 10 and 12. Recovery Action 10 states agencies should attempt, where possible, to "[c]onserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population." BiOp at 10, 14. To do so, BLM and FWS

ranked the 39 affected known spotted owl sites in the action area using (a) the duration of spotted owl occupancy and successful reproduction at each site and (b) post-fire habitat conditions. BiOp at 47; see also id. at 10, 14, 24, 47. This ranking enabled the agencies to identify up to 12 sites that warranted additional consideration for conservation measures. BiOp at 14, 47, 60, App. "C". For the top tier of identified sites, BLM avoided and minimized Project impacts by excluding over 800 acres of PFF habitat from salvage activities in core-use areas and Known Spotted Owl Centers.8 BiOp at 47. BLM also avoided and/or minimized road and landing construction and other similar activities within the high priority spotted owl site core-use areas. BiOp at 44 ("The proposed salvage harvest, to the extent practical, will avoid spotted owl nest patch and core-use areas.").

BLM focused its salvage efforts on spotted owl sites with demonstrated non-occupancy for several years prior to the fire. Id. As a result, BLM minimized potential adverse effects to spotted owls from the proposed action. Id. All of these actions were consistent with Recovery Action 10.

Similarly, the BiOp is consistent with Recovery Action 12. BiOp at 14 ("Recovery Action 12 is also applicable to this Project."). Recovery Action 12 states that "[i]n lands where management is focused on development of spotted owl habitat,

post-fire silvicultural activities should concentrate on conserving and restoring habitat elements that take a long time to develop (e.g., large trees, medium and large snags, downed wood)." BiOp at 14.

FWS discussed and implemented this guideline. Within the fire perimeter, approximately 75 percent of fire area burned at low severity. BLM excluded any the acres subject to low severity fire in the areas subject to salvage treatment. This left a large portion of the action area landscape with both burned and green legacy features (e.g., snags, downwood and a mosaic of habitat features) important to the spotted owl now and for future stands of NRF habitat. On the other hand, approximately 25 percent of the area (approximately 5,000 acres) within the fire perimeter burned at medium to high severity. Within this smaller area, only eight percent (1,612 acres) are subject to harvest. Because a relatively small portion of the area is proposed for harvest, and project design criteria provide for snags and downwood in the salvage areas, both green tree and burned legacy features important to spotted owls both in the short and long-term will be provided and broadly distributed across the action area.

Moreover, FWS and BLM took special snag related precautions in those areas subject to harvest. The applicable BLM Resource Management Plan includes snag retention requirements to retain legacy features for spotted owls and in doing so, helps ensure

34 - ORDER

consistency with Recovery Action 12. Record of Decision for the Medford District Resource Management Plan ("RMP") at 21 ("The general forest management area and connectivity/diversity blocks will be managed to retain late-successional forest legacies (e.g., . . . snags, . . . )"), 33, 39 ("Retain snags and green trees within a timber harvest unit at levels sufficient to support species of cavity nesting birds at 40 percent of potential population levels.") (found at BiOp App. Lit Cite A folder, Partial AR). While the RMP does not specify the number of snags that must be required, it did require BLM to retain enough snags to support cavity nesting birds at 40 percent of the potential population levels. Id. at 39. This would equate to 0.2 hard snags per acre for hard snag woodpecker users in Douglas-fir forests and 1 soft snag for soft snag users.

For the Project, however, BLM left 2-4 hard snags per acre on the landscape – up to five times more than the amount required by the RMP. BiOp at 47 ("Project will provide for a higher retention of snags (up to 5 times more) and coarse woody debris within spotted owl critical habitat and 0.5 mile core-use areas of high priority sites as compared to [BLM's] 1995 RMP standards for Matirix lands which is the underlying [land use allocation]' of the area ). The Project is therefore consistent with Action 12.

As with the other issues presented by plaintiffs, I find the government's action is not arbitrary , capricious, an abuse of discretion or otherwise not in accordance with the law.

## CONCLUSION

For the reasons stated above, plaintiffs' motion (#13) for a preliminary injunction is denied.

DATED this _____ day of September, 2014

_____
THOMAS M. COFFIN
United States Magistrate Judge

36 - ORDER